Hear ye, hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States in this honorable court. Thank you. Good morning, counsel. Welcome to this session of the Fifth Circuit VR video conference. I'm very honored to be presiding this morning with two esteemed colleagues, Judge Kyle Duncan, who's in Baton Rouge, and Judge Corey Wilson, who's in Mississippi, and I'm up in good old Shreveport. So we've kind of got you covered. We don't have a text, although we have the circuit covered, but as Louisianians, we're going to hold up the fort here and make sure we get through it. We've been, you know, fortunate the last few go-rounds, the Zoom has worked out, you know, well in terms of visually and audibly, so we can see you, you know, well, and so that's a good thing. And Ms. Pam is going to take good care of us over there. We've got our IT people, so if at any point you start fading or something like that, we'll try to pay attention and get it on. But at any event, this morning, we've got number 18-40598, United States of America versus Ricky Allen Thackrell and Christopher Cramer, federal death penalty case, so we're glad to have you here for the argument. So, Ms. Colthoff, you're leading off, and I believe you've taken 22 minutes in your opening. You've reserved some rebuttal time. Is that right? All right, ma'am, you're up. We're ready for you. Thank you so much. Good morning. May it please the court. My name is Donna Colthoff. I represent Ricky Allen Thackrell in this morning's appeal. Mr. Thackrell raises 16 issues in his appeal. With the court's permission, I'd like to address two of those issues, both claims of prosecutorial misconduct that occurred at the sentencing phase of this capital trial. First, I'd like to address the erroneous argument that the prosecutor made regarding mitigation evidence. That's issue 2A. And second, the improper rebuttal testimony given by two Bureau of Prison psychologists at the sentencing phase. In the government's closing argument during the rebuttal stage, the prosecutor told the jury that to mitigate means to make less severe, serious, or painful. He then invited the jury to imagine that while stabbing the victim, Leo John, Mr. Thackrell leaned in and said, you know, my dad was a drunkard who got so blitzed he drank plant water. He asked the jury, would that have made less severe, serious, or less painful? Would that have mitigated what was happening to Leo John? The prosecutor's definition of mitigation was incomplete in a material way and in a way that violated Mr. Thackrell's Eighth Amendment rights. Well, Ms. Cogstar, taking you at your point, you know, we all know closing arguments is not evidence. We know that. And so, you know, the judge gave a charge on mitigation, presumably the Fifth Circuit patent charge. So, assuming, you know, the potency of what you're saying in terms of counsel's argument, how is that going to cut against the charge that the judge has given the jury in terms of how to deal with mitigating evidence, especially to get you in an arena of reversible error? The Supreme Court has made clear that a prosecutor's remarks can, in fact, invade the jury and violate the Eighth Amendment. That's in a case called Abdul Kabir v. Quarterman from 2007. And here's why that's what happened here. Of course, what the lawyers say is not the law. The jury is instructed to listen to the district court. The district court told the jury before the prosecutor's argument, instructions occurred before the prosecutor's argument. And the district court gave the jury a definition of mitigation that comes from the Federal Death Penalty Act. That definition is circular. It says a mitigating factor is any aspect of a defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of the death penalty. That instruction does not define the word mitigate. So is your issue with the charge given as opposed to the prosecutor's argument? So if you're saying the charge is based on the statute and you say it's circular, as far as I can recall out of the 16 or however many issues, there's not an issue on appeal concerning the propriety of that charge. The instruction as a frozen in time is a correct statement. It comes out of the Federal Death Penalty Act. But the district court was required to respond to the case as it was occurring in her courtroom. And what happened in this courtroom was before the prosecutor's argument, she gave an instruction that didn't define a term that the prosecutor then supplied an incorrect definition for. So when the jury went to the jury room, it was more than free to plug that incorrect definition into the word mitigate that was given by the district court. All right. So did you, not you, but the counsel for Mr. Thackrell, you know, in teeing this matter up, we all know how it goes, was a proposed charge from the defense side to provide a definition of mitigation, which is missing in the statute, which would have prophylactically dealt with this issue before you get to the point of whether the prosecutor was safe. But if it's circular, was there a proposed charge separate from the pattern to give the definition? And so if I'm correct and understand it, there was no proposal. So we don't have any issue that defense offered a charge, judge says I'm not giving it. And so now you're urging, okay, there's error. So if that wasn't given and isn't there, I come back to how do we get to reversible error if the judge follows the pattern charge, the statute literally, when neither side offered to the judge anything other than following exactly what it says. You follow me? I do. And it leads exactly to my second point about why this error went into the jury room. Defense counsel, in fact, did supply the correct definition. Defense counsel objected three times to this argument and defense counsel asked for a running objection. In defense counsel's third objection, defense counsel supplied the correct definition of mitigation under Tenard. Word for word, your honor, the jury can consider this evidence for other reasons. This is incorrect. And the district court said, well, that's overruled. So I think we can assume, I think it's clear in the record that defense counsel did, in fact, ask the district court to turn to the jury and make sure that the jury understood the fullness of this authority. Under Tenard, under Lockett, and under Penry. The district court wasn't silent. The district court didn't say move along. The district court said, well, that's overruled. Defense counsel was handing the court a lifeline. Had the court stopped at that point and said, ladies and gentlemen of the jury, you're instructed that here is the correct definition, I probably wouldn't have prejudice. The district court could have maintained its denial of the objection and said, ladies and gentlemen of the jury, I'm overruling the objection, but you were instructed that the full definition of mitigation is the definition in Tenard. The district court didn't do that. The district court said, well, that's overruled. So now we have a jury who has been given an instruction that doesn't answer the question that the Eighth Amendment requires the jury to have an answer for. We have a prosecutor that crossed the line and told the jury that it's permitted to exclude, even from its consideration, factors that don't fill that definition. And we have a district court who, when given the opportunity to set things straight, word for word, said to the jury, well, that's overruled. And under those circumstances, Your Honor, I don't see how that instruction, that definition was not carried into the jury room. And I wanted to put a little exclamation mark on that point by telling you that the jury, the mitigating factors that were submitted to the jury can be divided roughly into two piles. One pile are factors that clearly, patently have absolutely nothing to do with the offense at issue. So the fact that Ricky made friends with someone in juvenile detention, the fact that he loved his family, the fact that he forgave his family, the fact that he liked to read, the fact that after he came back from ADX, he did not display any violence. Under no stretch can those facts be seen as explaining the offense, justifying the offense. I encourage the court to look at the jury verdict form. On those facts that cannot be said to be related to the offense, Ricky Fackler got all zeroes. There were no findings on any fact that is not arguably related to the offense. Then there's another stack of findings. And that stack, those findings are a little bit ambiguous. Someone like me might look at a fact like Ricky's father had delusions and drank plant water and find a connection between that fact and the offense. But others might look at that fact and say, I don't see any connection there. I don't see any connection there. That happened when he was a kid, like the prosecutor said. On those facts, Ricky Allen Fackler got a lot of zeroes. All of his early childhood facts were zeroes. He got some findings on those facts. And I also want to point out that on the plant water fact, the one that the prosecutor explicitly referred to in his argument, Ricky got a zero. He did get some findings on some of those facts. But because of the improper instruction, we have no way of knowing what the jury did with its findings. Because the prosecutor told the jury it has to be connected to the offense. We don't know how many jurors didn't make findings because they were applying that definition. If they were the kind of juror who agreed with the government that Ricky's dad's delusions have nothing to do with the offense, then they were likely not to give Ricky a finding on that factor. Well, correct me if I'm wrong. I mean, it's a lot of reading here. And, you know, I've had to read this over time. But weren't there, what was the total number of mitigating factors? Wasn't there like 150-something mitigating factors? Yeah. So, I mean, there was a lot of mitigating factors as things go. And my recollection, when I look at my notes, the jurors did ascribe some mitigating factors. I mean, it wasn't a total zero, you know, across the board. I know you're honing in on a particular set. But, I mean, with 150-plus mitigating factors, I mean, that's a lot. I'm not suggesting it's too many. But it means there was a lot put there for the jury to work their way through. And so, in the end, the jury did work through and, you know, accepted some and others and so forth. So, I mean, how does that, you know, cut to your argument? I mean, if the jury, you know, if there's 150 and there's zeros all across the board, we can't get in the juror's head. But, I mean, the fact that the jury worked through so many mitigating factors, you know, described some to them and so forth, I mean, doesn't that indicate, with the standard review being what it is, that the jury, you know, did do what it was supposed to do, maybe not to, you know, the desirability of your client. Do you understand my question? I absolutely do. Your Honor, I believe the standard of review under the Federal Death Penalty Act and under Chapman is harmlessness beyond a reasonable doubt. But even if it were not harmlessness beyond a reasonable doubt, we do ask a lot of these capital jurors. 156 factors, that's a lot of factors. But we're not doing them any service and we're certainly not serving the Eighth Amendment if we don't tell them what they're permitted to do with those factors. Mr. Fackrell had a right to have a jury consider, yes, extenuating facts, things that might have mitigated or made less culpable his conduct in this offense. But he also had a clear right under cases like Skipper v. North Carolina to tell the jury that his was a life worth saving. Setting aside the offense, his was a life worth saving. He was a good kid. He suffered from trauma. He was exposed to alcohol and drugs when he was a child. Well, I'm not trying to beat a dead horse. Don't get me wrong. I'm just trying to get to it. I mean, you're an able advocate, to put it mildly. But I'm just saying, you know, I read 156 mitigating factors and the jury had that to deal with. Jury's got the mitigation, instruction, you know, et cetera, working through. And so, at the heart of it, it seems that the gravamen of your argument is with the statute. The way the Federal Death Penalty Statute is worded, what it says and doesn't say, as opposed to what the judge did. I mean, clearly reading this big record, which I read a lot, they tailored this to these two defendants. So, I hear you, but it just sounds somewhere out there, your beef is with the statute. The Federal Death Penalty Act, what it says and doesn't say, we all know statutes can be a little cryptic. Am I reading that, am I totally off the mark? Well, I certainly wish the statute was clearer. I don't like circular definitions. I'm a former English teacher and they rankle me. But in fact, your honor, that instruction likely would have been okay had the prosecutor not made this mistake. Because the attorneys would have argued, right? The attorneys would have argued the correct definition. The district court would have told the jury that the attorney's arguments were not the law. The jury would have gone back, they would have made sense of the instructions, understood properly. But what happened in this case is that the jury was told something that was incorrect. The Federal Government... I'm going to ask you one more question and I know you want to get to something else, but I'm really trying to understand because as you pointed out, you've got a ton of issues, service and all that, but you've cut to the chase on the ones you think make a difference. Now, I'm one of these old fashioned judges, I go straight to the trial judge, okay? I know my role. Now, Judge Marsha Crone, being in Beaumont, has drawn a slew of death cases. You know that. She's had a slew of them. You know, it ain't on her commission, but she's had a bunch of these things, okay? So my point is, you know, she's had a lot of death cases and I don't mean that to say because you've had a lot and one can't make error. Don't get me wrong. But I'm saying, you know and I know, the good trial judges have lots of death cases, period. Very careful as far as, you know, handling this, et cetera. It looks to me a lot of latitude there. So I don't mean she can't make error, but I'm trying to appreciate the argument she's making. And if a seasoned trial judge handling these death cases, got two defendants, got able counsel in front of her and so on and so forth, this is not the first time she's confronted mitigation in terms of how to channel this. So where do you say, and I don't want to take all your time, but I guess what you're going to say is she erred when she didn't pivot on the argument of the prosecutor. Is that what you're telling me? I'm going to say she didn't cure the prosecutor's error. I want to focus on the prosecutor, also a seasoned prosecutor. This definition was made in rebuttal. This definition was given in rebuttal when there was no opportunity for anybody to respond. The district court didn't cure the error. The district court, in fact, appeared to endorse the error and the jury took that error back with it into the jury room. The error is the prosecutor's argument. The district court's ruling didn't correct that error and in fact appeared to endorse it. And I want to suggest to you, your honor, that this argument does not require that we find that Judge Crone is not a seasoned judge who does a good job in death penalty cases. Judges want to keep close to pattern jury charges. That's understandable, right? That's what trials do. And move with the things that are happening in front of her. And she just dropped the ball here. Okay. I mean, I hear you and I certainly was not trying to say because she was seasoned she couldn't make an error. Not at all. But I'm just trying to zone in. You know and I know it's a rare day when we reverse a case based on a prosecutor's argument. It happens. I'm reading the same case as you are. But you know, I mean, that's an uphill sled with a greasy pole, you know. And so is this going to take a lot, you know, to get there in the scheme of a huge trial like this, two defendants, all this stuff and the prosecutor. But I get your point. You're saying it's major rebuttal. No fairness. I don't want to take all your time on that. You've zoned in on it. And if you want to argue the other point, I think we get it. And I didn't mean to predominate it if my colleagues had questions about that. But since you zinged in on the mitigation and on the issues, there's a lot here about this mitigation. Let me take you to, well, maybe I don't know which one you're arguing. So the thing about the experts, help me with that, the psychotherapists, is that your issue? Absolutely. I'm going to be talking about that issue to you as well. This issue involves penalty phase, again, rebuttal testimony. The government brought in, under the guise of rebuttal evidence, two BOP psychologists who had examined and met with Mr. Fackrell a little bit before he moved to ADX, more after he came back from ADX. Included in the packet of rebuttal evidence from the BOP government offered was an instrument that had been given to Mr. Fackrell, something called a personality assessment and inventory, back in 2006, about eight months before he went to ADX. And then testimony from these psychologists about statements that Mr. Fackrell had made to them during interviews and examinations, many of them while trial and sentencing were proceeding. Can I ask you a question about this? So could you speak to whether this error as to the testimony of the psychologists or maybe psychiatrists or psychologists, was it preserved? Was error preserved? And if so, where was it preserved? It absolutely was preserved. And I have a chart here, and I'm just going to run through some page numbers for you. So on RLA 11-243, we objected to the introduction of the instrument. On RLA 11-244, we re-urged objections we had made the day before, which involved the Fifth Amendment, the Sixth Amendment, and the Eighth Amendment. On RLA 11-245, we objected to the second packet of documents in total. On RLA 10-979, we raised Sixth, Eighth, and Fourteenth Amendment objections. On RLA 10-981, we argued that this was improper rebuttal. We made the same argument on 10-990. We made the same argument on 10-996. On argument on page 10-979, we objected to the entire report coming in under the Sixth, Eighth, and Fourteenth Amendments. And then on 9-81, 9-90, and 9-96, we made improper rebuttal arguments. Well, that's very helpful. Thank you. Will those objections include the objections with respect to patient privilege, patient psychotherapist privilege? Your Honor, we pointed out on page 10-979 that this testimony, Mr. Fackel's statement, came out of interviews with his psychologist. I would suggest to the court that that's sufficient to bring this issue to the court's attention, which is what's required for preservation. If it's not, it's certainly plain error. Okay, thank you. And I don't mean to take up your time because I do want to talk about the substance of it, but please go ahead. That's all right, Your Honor. I had to make a chart so I completely understand. So, mainly I want to talk about the Sixth Amendment. That's not because I don't think the Fifth Amendment is implicated. I do, in particular, I think the Fifth Amendment comes into play at the time that that PAI was administered. Let me stop you. Madam Clerk, there's a lot going on here, as I said. Give her another three minutes, and I'll equalize as we go. So, go for it, Ms. Koltoff, and exhaust this one. Thank you very much. The decision, of course, whether to submit to a mental health evaluation or to make statements to a mental health professional while you are awaiting trial has enormous consequences in a capital case. Evaluations produce diagnoses that the defendant never escapes throughout the pendency of the capital appeal. Those diagnoses follow him. Let me just ask you this, cut to the chase. Is Estelle v. Smith your best case? Is that your best case for this issue? Your Honor, Estelle v. Smith and Powell v. Texas taken together are our best case. Estelle v. Smith establishes the Sixth Amendment right. Powell v. Texas makes clear that that right persists even if the evidence is being offered for rebuttal. And Powell v. Texas makes another point that's very relevant in this case. Even if Sixth Amendment warnings and notice are given, Powell v. Texas teaches us. The rebuttal has to match the medical evidence that the defendant put in. The prosecutor is not free to reopen its case in chief and make arguments about future dangerousness and remorselessness that are not attached to the defendant's mental health case. Our mental health case was major depression and post-traumatic stress disorder. Any evidence that exceeded that medical evidence was accepted and even if warnings had been given would have violated the Sixth Amendment. Mr. Fackel was being treated by the psychologist after he came back from ADX. The reports that were made as a result of these evaluations said that he had major depressive disorder, he had post-traumatic stress disorder, he was having nightmares as a result of seeing the evidence presented at trial. He was being medicated for these disorders. There's no rebuttal here. The BOP experts agree that Mr. Fackel was depressed and suffered from post-traumatic stress disorder. This rebuttal evidence was designed to shore up the prosecutor's case in chief by using Mr. Fackel's uncounseled statements against him. That's what rebuttal is. I mean, that's what quintessentially rebuttal is. The prosecutor shored up his case. I mean, that's definitionally why it's there. But you're saying it was a foul ball. I'm saying that there was proper rebuttal to be had here. Dr. Hayes gave proper rebuttal. But talking to Mr. Fackel without an attorney present and without telling him that statements that he made while he believed he was being treated might be used against him in his trial by the same people who were treating him is a very big foul, Your Honor. All right. You're out of time. Let me ask you this question just so you can answer it straight on and you have some rebuttal. Was there any in limine type proceeding held to deal with this issue? You know what I mean? Or did this kind of occur, you know, in the run of the proceedings? You know what I'm asking? The records suggest to me that trial counsel was somewhat surprised by this. There was a three or four page out of the presence of the jury conference on the first day that this came up. There was a second one on the second day. But I don't think that defense counsel anticipated or frankly should have anticipated that experts were going to come in and use Mr. Fackel's own counsel statements against him. Okay. Yeah. No, no. I wasn't describing any kind of fault, you know, to anybody on it. Just, you know, having been there myself, I know sometimes you get these issues when you're on the trial bench and you're like, okay, let's take a recess, you know, and have an eliminator, you know, kind of unpack all of this and get the law and so on and so forth before you head back in. So I was just asking that more as a procedural one. So if it's somewhere buried in this huge record, you know, our eyes would go to that proceeding. You follow what I'm saying? I wasn't asking and suggesting that, you know, any lawyer did anything wrong. Just, you know, you get in a trial, they're dynamic. Sometimes these issues crop up and you call timeout and just kind of eliminate or, you know, try to deal with the law and all that. Judge makes the ruling on it. So it was just a matter of help for having it to the record to know, you know, to look for some proceeding or something like that. But I got your point. So you helped us on your opening and you've reserved some rebuttal time. So let's shift gears and hear from Mr. Bolzer and we'll be back to you in rebuttal. Thank you so much. Good morning. May it please the court. My name is Sean Bolzer and I represent appellant Christopher Kramer. With the court's permission, I'd like to focus on two issues. Point number eight from our brief about the district court's response to a note from the sentencing deliberating jurors about the process in the event that they could not return a unanimous verdict. And I'd also like to focus on point 7B from our brief, which is a challenge to the prosecution's argument in closing, in sentencing, asking the jurors to draw an adverse credibility inference from the fact that the defense strategy at penalty was inconsistent with defense strategy at the guilt stage. I'd like to begin with point eight of our brief. The district court's failure to respond to the sentencing jurors' notes about the process in the event they could not reach a unanimous sentencing verdict. After nearly a full day of deliberations, the jurors sent out a note asking, what is the process if we are not unanimous with our verdict? Under the clear cases of this circuit and the United States Supreme Court, once jurors have expressed confusion, the district court has a duty to provide a reasonably responsive answer and to clear up the jurors' confusion. As the defense requested, the court, having received that note, had an obligation to provide two answers. First, at a minimum, it should have informed the jurors that in the event they could not reach a unanimous verdict, they should report that back to the courts. Two, and I don't think that this court needs to reach this far. I think that the answer number one alone suffices to require reversal. But it should have also informed the jurors that in the event they could not reach a unanimous verdict, it would impose a sentence of life without the possibility of parole. The district court utterly failed to answer the question at all. Instead, it merely directed them to, quote, please continue your deliberations. Its failure to respond risked suggesting to the jurors that a not unanimous verdict would never be acceptable and thus risked coercing a verdict in violation of the Eighth Amendment. The jurors' notes, jurors' questions, what is the process if we are not unanimous with our verdict, clearly indicated that they were confused on a significant point of law, which is not surprising. They had been told during the final sentencing instructions that the mitigating factors had to be found and weighed individually, and that the final decision as to what the appropriate punishment should be would also have to be an individual determination. They were told you should reach an agreement, quote, if you can. They were told, quote, each of you must decide the case for yourself, and you should not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. But the sentencing verdict form provided only two options, unanimous death, unanimous life. So it's not surprising that jurors would find some confusion. They've been told that their determination was highly individualized, but it provided no – the verdict sheet provided no mechanism for them to effectuate individualized determinations where they couldn't reach unanimous decision. Under this court's clear case law, United States v. Footcraft, when a juror makes explicit its difficulties, a trial judge should clear them away with concrete accuracy. This is also United States – Bullenbach v. United States from the Supreme Court. And on review, the question concerning the supplemental instruction is, was the answer reasonably responsive, and whether the original and supplemental instructions as a whole allow the jury to understand the issue presented to it? Here, the question was, what is the process that we cannot be unanimous? And the answer was, please continue your deliberations. So the response – in fact, the court utterly failed to respond at all to the question. Not only did it not provide a clear, reasonably responsive answer to clear away the confusion, but it simply did not answer the question asked to the jurors. And the response, please continue your deliberations, in response to what the process suggests, I think, that a not unanimous verdict might never be acceptable to the court. What is the process? You continue your deliberations. That then risks the jurors feeling compelled to give up their individually held views as to the mitigation or to the final sentencing, and to come back with a unanimous verdict, whether or not it reflected their conscientiously held views. This is not controversial. This kind of response to a question like this is not controversial. In the guilt phase of a – sorry, in a noncapital trial, when a juror asks this kind of question, the Fifth Circuit pattern instructions include the response, report back that you're not unanimous. In fact, it goes a step further and tells them that a retrial will follow in the event of such an outcome. The trial court relied on Jones v. United States, where the Supreme Court held that the Eighth Amendment does not require every juror to be told of its effect of non-unanimity. So, you and the government, I guess, are sparring over the probative worth of Jones vis-à-vis this situation. You say this is something different. Is that what your argument is? A hundred percent, yes, Your Honor. So, part of our Jones is about whether or not the jurors had to be informed that if they were not unanimous, the defendants would receive a sentence of life without parole. Jones in no way addresses a response to a question from the jurors, an explicit expression of confusion. And it also doesn't deal with the question of the first answer we're saying that the court shouldn't supply, which is report back to me that you have a not unanimous verdict. If that is what happens, you tell me that. And, in fact, in Jones, that had been done. So, Jones is a detour. I think the court should have told the jurors what would have happened to the defendants if they had not been unanimous, but we don't have to go that far. The failure to simply answer the question, if you're not unanimous, the process is, you tell me you're not unanimous. The court could have said, what happens next is none of your business. But it's the failure to answer the question in any way that constitutes the error here. And coupled with the fact that the court's response, please continue your deliberations, is an Eighth Amendment violation. It risks the jurors, coercing the jurors into a unanimous verdict, notwithstanding. So, Jones is a side issue. I'd also note that the Supreme Court in Lowenfield and this court in Fields has approved exactly this kind of response to a juror's deliberation question. In both cases, in Lowenfield and in Fields, the courts had told the jurors, report back that you're not unanimous, and I will impose a sentence of life without possibility of parole, the two things. But, again, I don't think we have to go to the second step. I think the error is in not responding at all to the jurors' questions and not telling them, report back. What is the process? You tell me. You send me a note and tell me you're not unanimous. And, again, this is what happens. This is not controversial. This happens in non-capital cases all the time. If the jurors send a note about the possibility of difficulty reaching a verdict, the Fifth Circuit pattern instruction charge tells them, go back, try again, don't surrender your beliefs, and if you can't be unanimous, there'll be a retrial on this. So, this is not a controversial point. And we've looked at federal death penalty cases. You know, capital sentencing would make it, I think, even more important, since the emphasis at a capital sentencing deliberation is that they're told over and over again that their decision must be individualized. So, it's not surprising that they might have some confusion about how to effectuate that individualized determination. Which distinguishes it from a non-capital deliberation where the emphasis is not on individualized determinations but on finding a historical fact. This is a very highly subjective individualized moral response which they're told. And if they've got some confusion about how to effectuate it, it's critical that the district court respond to that question in a very concrete way and clear up that confusion. If there are no further questions on that point, I'll turn to my second point. I'd like to turn to point 7B, in which we challenged the government's penalty phase formation, in which it urged the jurors to draw an adverse credibility inference against the defense witnesses. Because the defense counsel, at the guilt-innocence part of the proceedings, had urged the jurors to find him not guilty. This argument impacted two constitutional rights. The defendant's Sixth Amendment right to plead not guilty and to demand that the government prove its case beyond a reasonable doubt. And an Eighth Amendment right, the Sixth Amendment right is embodied in United States v. Jackson, and an Eighth Amendment right embodied in the Supreme Court case Gregg v. Georgia that permits a bifurcated proceedings. It allows the defendant to contest his guilt separately from penalty to avoid prejudicial overlap between those two. And the government's argument here repeatedly asked the jurors to draw adverse credibility inferences from the defendants having exercised those rights. Here's the actual closing that we object to. So we're here to talk about mitigation. Before you can consider mitigation, you have to consider the source of that mitigation. And you get to consider all the things that you have heard in this case today. And let me tell you, there's been a miraculous transformation. Because these two defendants, at the outset of the trial, through the work of their criminal defense lawyers, told you what? No, we didn't tell Leo Johns. We just went in to counsel him. He was an errant brother. He'd gone into the ditch, as I heard someone say. And then we were shocked and dismayed. He pulled a knife and attacked us. Ricky Fackrell, just standing off to the side in silence, he couldn't believe what was happening. Christopher Kramer, necessary to defend himself, disarmed Leo Johns, and then took out his own knife and stabbed him all those many times. That's what you were told. Like I said, there's been a miraculous transformation. Now they're telling you, well, yeah, you're right, we stabbed him. But we stabbed him because we had all these problems. We had terrible childhoods, given. And then the argument continues a bit further. You have to consider the source before you can consider whether one of those supposed mitigators was proven. According to Kramer's attorneys, Chris Kramer was raised in an noxious environment. Christopher Kramer was raised in a toxic environment. And that somehow mitigates his particular offense. What the government is urging the jurors to do is twofold. It's asking them to infer, to conclude, that Mr. Kramer's defense counsel had engaged in sharp practices. That they'd done something improper in the first stage in pleading their defendants not guilty and asking the jurors to find the government had not proved this case. And then switching their tactic to saying, okay, yes, we acknowledge your verdict, but here are reasons why you still should not impose a sentence of death. There's a suggestion that that's somehow improper, that that's tricky. And second, I think the suggestion is that you shouldn't trust these lawyers. Lawyers who engage in this sharp practice are just throwing up anything at the wall. They're throwing up whatever they can. They don't actually believe what it is they're telling you themselves. And so why should you believe it? And that cuts right to the heart of the case in mitigation. The defense objected. They said, Your Honor, I'm going to object that's an improper attacking of defense counsel by stating that this is something from the attorneys. It's based upon the evidence from the witness stand and from exhibits. It is improper closing arguments and attacking counsel. And before arguments, they had filed a lengthy motion in limine, outlining various categories of misconduct and closing that we've collected from cases across the country in federal death penalty cases. So identifying fairly concretely both denigrating the defense and asking the jurors to draw an adverse inference from the fact that a defendant has pleaded guilty. The court granted the motion. The defense asked the court to strike. The jurors, the court granted that motion, struck it. And then they asked for a mistrial, which the court denied. This case is on all fours with a recent decision in out of the Second Circuit, United States versus a car in which the Second Circuit reversed federal death penalty on direct appeal for exactly the same problem. Exactly the same kind of error. What's the name of the case? United States versus a car. A Q U A R T. We have that one? Yes. Sorry, I can give you the citation. I'm sorry. I mean, if it's in the brief, since I've read so many cases. I apologize. It's absolutely in the brief. It's the centerpiece of this argument. Got it. So the Second Circuit confronted the same argument where the government asked the jurors to find, to draw an adverse inference from the fact of inconsistent theories between guilt and sentencing. And where the defense counsel had objected, the court actually gave a curative instruction in that case saying you should not consider the strategic choices of a defense counsel. And still, and the defense in that case didn't ask for a mistrial, didn't ask for a greater curative instruction. But on direct appeal, the court unanimously found that the simple you should not consider defense counsel strategic choices didn't suffice to cure the error. What was required was a specific instruction. One telling the jurors specifically that that's not improper. What the defense counsel did is absolutely not improper. They've done nothing shady. And it does not in any way reflect counsel's views on the credibility of the various witnesses. Those two things were required to actually get at the harm of the misconduct. And the court noted it's critically important in a capital sentencing proceeding like this where an argument like this that goes to, that both trenches on specified constitutional rights and goes to mitigate the credibility. Given the peculiar nature of a capital sentencing determination. So it just takes one juror. If one juror holds out for life and they return a unanimous verdict, that means that death can't be imposed. Two, the jurors aren't asked just to find as a historical matter whether or not the mitigating factors were proved by a preponderance to have occurred. But they also assign individualized weight. How much is that weight? So they're going to put it on the scale. They have to determine how much weight to give it. And given kind of that unique aspect of a capital sentencing deliberation, this kind of argument gave them, left them with no confidence that the jurors would have reached the same verdict in the absence of such misconduct. And again, as Ms. Coulthard mentioned, the verdict sheets suggest a problem. There are a number of zeros and very low numbers for mitigating factors that were clearly proved that were not controversial. But this argument that you should factor, you have to consider the source, and that the source is defense counsel, I think is reflected in these zeros and these low numbers regarding what should not have been controversial. I would note the government's main argument in response is Jones, which I think we've discussed already. They also note that it's okay for the government to have been in the minds of the jurors. You're not telling them anything that they wouldn't have known themselves. But Griffin v. California addresses this issue. The fact that the jurors might hold against a defendant his failure to testify is not a license to put the courts in premature on it or to put the government in premature on it. The fact that they might naturally reach that place is not a license. And Griffin, they reverse notwithstanding. And I would note, I think that that actually goes more to our point. I think it is probably true that jurors might naturally have that in their head. They might see that and they might wonder about that. And I think that, therefore, having stepped into it, the government having stepped into it, the obligation on the court was to give a very strong charitable instruction once it grants a mistrial. And what the court did here did not cure the effect of this mistake. If there are no further questions from the court, I'll reserve my time. All right. Thank you, Mr. Wilson. I appreciate your argument. All right. We'll hear from the government. Mr. Visotsky. Good morning, Your Honors. Counsel, I was going to start with just a broad recognition, which Judge Stewart has already brought up about that this was an experienced trial judge. Judge Cronin handled at least four or five definitely cases in Beaumont arising out of the Beaumont prison. And that's not to say that she's infallible, but just that in our view that this was a very clean trial that was presided over by an experienced trial judge in these matters and also by several prosecutors who are very experienced in these cases. To respond to Mr. Fackrell's arguments about the prosecutor at the selection phase, when he was defining what it means for mitigate and he pulled out the big scenario and said that mitigation to make less severe, serious, or painful. And as we point out in the brief, that that is not much different at all from the prosecutor's argument in the Supreme Court's case in Boyd, where the prosecutor argued that the defendants mitigating evidence did not suggest that the crime is less or that the gravity of the crime is any less. And nothing I've heard lessens the seriousness of the crime. And the Supreme Court in Boyd found nothing objectionable with those comments. And it's particularly striking that in Boyd, the prosecutor used the term less serious, and that was also included in the prosecutor's definition of what it means to mitigate. And I would also point out that in the Fell case out of the Second Circuit at page 222, note 14, two out of three judges on the panel in that case said that the Supreme Court has never held that when arguing the weight of the evidence, the prosecutor may not question the connection between the mitigating evidence and the defendant's crime of conviction. And that's exactly what the prosecutor was doing here. He did not use the term weight. And in the reply briefs, the appellants take some issue with that. But even Kramer in his opening brief recognized that the prosecutor discouraged the sentencing jurors from giving full weight to the mitigating arguments. And that's at Kramer's opening brief at page 146. And in terms of the connection between mitigation and the crime of conviction, what the cases say is that there's no requirement that the mitigation evidence be connected to the crime of conviction, but there's no prohibition on making a connection between the two. And I think that that's what Judge Crone recognized when she overruled the objection when she said that one of the factors that can be considered is the circumstances of the offense. And what the cases that the appellants primarily rely on show is that a court cannot exclude mitigation evidence from the jury's consideration that is not connected to or is not tied to the crime of conviction. Let me add, Mr. Petrovsky, on this, you know, a lot of the issues, as you know, have been raised so far go to the mitigation piece. Ms. Coulthard sort of drew a line down the middle of the page and says, well, we have two piles of mitigation, some unrelated to the crime, da-da-da-da. So, as I recall, you know, there was 156, give or take, you know, mitigating factors, you know, there, et cetera. You heard the, you know, the arguments. So, you know, respond, if you will, to this. I mean, it was just a lot of mitigating factors, and I don't mean to suggest by that it was too many, just that there was a lot that the jury had to weigh through. And you heard her argument that notwithstanding that, this argument of the prosecutor just kind of sent the jury, you know, off the mainland in terms of how it was to consider the mitigation. So, she said the potency was in the prosecutor's argument, and you heard my question to her. We know argument is them, but she said that had the effect of steering the jury, you know, out of the heartland of how it's supposed to deal with mitigation. So, what do you say? Well, I think the prosecutor's argument in total gave a full picture to the jury of the type of evidence that it could consider. At the selection phase, the prosecutor that gave the opening argument explained that mitigation is not something, mitigation evidence does not have to excuse or justify the crime. And in the rebuttal, the prosecutor argued that, you know, what we've been talking about, that, you know, gave the dictionary definition and focus on the connection to the crime of conviction. So, I think that the jury certainly was not limited in its consideration of mitigation evidence. The fact that the defendants combined had over 300 mitigators disclosed to the jury that they could consider, and just the volume of evidence. This is a 24,000-page record, and the jury, you know, a good deal of that came during the mitigation phase. So, in no way was the defense precluded from presenting, you know, fulsome mitigation cases, and I think that the record bears that out. In terms of the Mr. Fackrell's second point raised today about the psychologist, as far as the standard of review, the improper rebuttal arguments were preserved. The Sixth Amendment issue was preserved. The defense team for Fackrell did not raise the psychotherapist's privilege. Well, let's just assume for the sake of this argument that it is preserved so we don't go down, you know, that trail. We also look at it and see that it didn't, but for purposes of discussion here, let's assume that it's raised. So, let's, you know, reel it in, kind of fast forward. You know, they put their stuff up. You know, you put these psychotherapists up. You know, long rebuttal, you know, kind of a gotcha there, you know, in awe. Wait a minute, you can't do that. Put these people up to opine, which, you know, when I read it, it catched me a little bit off guard with this. So, the briefs go round and round about whether or not the common law privilege is eclipsed by the statute and so forth and all of that. But, I mean, they say, yeah, you get rebuttal, but this is a foul shot. When these guys, you know, talk to these people, it was therapeutic. You know, they never expected to see it hit them between the eyes. You say, well, you know, these doctors in the running of the prison, they get to talk to people, and they were just kind of doing what they do. You know, but, you know, if people go to the doctor in the hospital, you know, routinely, but they don't expect to see their doctor on the stand later saying X. So, what, I mean, what about that? Well, I think that it went both ways here because Mr. Fackrell certainly used statements that he had made to Ms. Clemmer, the psychologist at ADX, as part of his mitigation case. And, yes, I agree that there's something that just gives you a little pause that some of the statements made that Mr. Fackrell gave to the psychologist occurred during the trial. But I would point out that there's no accusation here, no allegation, and certainly no truth in the fact that the prosecutor somehow, you know, sent the psychologist in there as agents to get, you know, favorable testimony for the case. That was discussed before Judge Crone. The prosecutor took some umbrage to that, and the defense counsel kind of, you know, withdrew from any suggestion of that. Even taking that to be true, because if that were the case, we'd have a whole nother issue involved. But I'm just coming back to the point of somebody goes to the doctor, prison or otherwise, and they're kind of, you know, unleashing whatever, if it's in the scheme of rehab, et cetera. I mean, you know, I mean, you know, in a criminal context of Fourth Amendment, we say, well, is there an expectation of privacy? So to kind of frame it that way, I mean, is there sort of an expectation of privacy if they're talking to these physicians? The government doesn't take the view that they're not physicians or, you know, the statements aren't given in what we might say, you know, kind of the therapeutic patient kind of setting and so on. So is there nothing to that? So is the government's argument, once they put their mental status in evidence in litigation, is the government's point that, you know, sort of no holds barred, that your ability to rebut just kind of eclipses any of those other notions? Yes, Your Honor, and I think that's what the law supports, that once the defendant does introduce his mental state, he also introduced evidence that resulted from consultation with BOP psychologists when he was at ADX. And so I think it's perfectly fair to rebut that evidence that the government would be able to present what Mr. Fackrell told BOP psychologists when he was at USP Beaumont. And I would – Does that aspect of this case adequately distinguish Estelle versus Smith in your view, the rebuttal piece? I think it does, Your Honor. Well, what they say is that what Ms. Coltharpe said is that, yeah, fine, but Powell versus Texas sort of closes the door on that or adds a different aspect to it. What's your response to their citation to Powell v. Texas? I have no specific response, Your Honor, other than to refer back to the brief. I'm sorry I'm not completely familiar with that. But I would push back on the suggestion that's in the brief and that we heard today that the BOP psychologists that the government introduced agreed with Ms. Quimmer's finding that Mr. Fackrell suffered from depression and PTSD. To the contrary, Sarah Johnson, who was a BOP psychologist with Mr. Fackrell before he went to the ADX, said that Mr. Fackrell did not display symptoms of depression or PTSD, and the same goes for Crystal Brown, who had some contact with him after. It's true that they did not change the treatment plan from a higher level of treatment and care based on the care that Mr. Fackrell received at ADX. But there was also some suggestion that they were looking into changing that, and I think it was just out of deference to the care that he received at the ADX. But they certainly did push back and disagree with the finding that he suffered from those conditions, and in that sense that they were proper rebuttal. Turning to Mr. Kramer's arguments, the inconsistent theories issue, the standard overview is of importance here, I believe. Of course, we've argued that it was not preserved. If you look at the transcript, there was an objection by the defense to, again, that the prosecutor just didn't understand what mitigation was, but there certainly was no objection to any suggestion that the prosecutor was arguing that the defense had transformed from, you know, we didn't do it to we did it but we're sorry that, you know, we did, and we did because we had bad childhoods. There was no objection on that score, so I think we are under the lens of plain error review. And Fackrell, in his opening brief, agrees with that. At page 8182, Mr. Fackrell, who raised that same issue, said that plain error review applies. I mean, I think part of it, and I understand, you know, where Mr. Kramer is coming from on this, but, you know, to some extent I think it's advocacy, and because we are under the plain error standard, there's no sense that or there's no way that Mr. Fackrell, or I'm sorry, that Mr. Kramer can show that his substantial rights were violated by these comments, because it was so obvious to any person of ordinary understanding that there was a dramatic difference between the guilt-based presentation and the selection-based presentation. And also the prosecutor made the comments and moved on. They were brief. They were unobjected to on that ground, and the prosecutor went on. Mr. Kramer referred to a car. I call that a quart, but it's a case that he said is on all fours. I would differ with that. For one thing, Mr. Kramer, in his reply brief, says that the error in a car was not preserved, but it very clearly was. The Second Circuit there said that the defendant objected to the prosecutor's comments, and the district court commendably recognized the government's errors and sustained objections. Now, there was some further discussion about, on appeal, I believe, the appellant complained that the instruction that the court gave after the prosecutor's comments wasn't good enough, and he didn't object to the instruction that the court gave. But the defense in a car certainly did object to the prosecutor's comments, and that did not occur here. A second point of distinction is, in that case, it wasn't only an argument about inconsistent theories. The prosecutor in that case specifically suggested, or at least reading the opinion, it suggests that the prosecutor led the jury to believe that the defense attorneys had put someone on the stand at the guilt-based presentation, a witness, that they just didn't believe, and they suggested that the defense attorneys knew that and essentially forward a false testimony. And that piece is not present in this case. And finally, as to the jury note issue, I frankly just don't get the argument on this one, and I think that the district court was correct. Well, Mr. Bolzer, I mean, saying it succinctly, Mr. Bolzer says, look, in a noncapital case, if the jury came back and says, what happens, you know, if we're not unanimous, Mr. Bolzer says, in a noncapital case, the Fifth Circuit pattern, and the pattern charged in the typical, the judge would give the jury, you know, additional instruction and explanation. But he says, in this capital case, federal death penalty, jury comes back with similar what happens, da, da, da, and he says the judge just says, you know, basically nothing, denied. I mean, there's no explanation, you know, on it. And so part of his argument is that it's even more important in a capital case that when the jury asks this question that the judge give additional clarification. So if it's true in a noncapital case, he says it's reversible error to not do so here. I'm not trying to make his argument. That's just the way I understood what he said. And so he's urging, so he doesn't have a case on point, that the jury, you know, his second point was, well, going further about explaining the life sentence, but he's not hanging his hat on that. He's just saying, he says it's reversible error because in this noncapital case, the judge, when the jury's asked, he, you rely on Jones, and you say Jones is distinguishable, rather, you know, because, because. You know, he says, well, it's not distinguishable. Well, I'm missing. He says it's distinguishable because here, you know, you get the question. And he says Jones says what it says, but its potency stops there because on these tailored facts, you get a different circumstance. I think I'm recapping the deal. So what's your argument, you know, there? You know, I mean, it gave me pause, and when I read it, I'm like, okay, what's the government got to say? I mean, you say you don't get the argument. Maybe I don't, but I think I recited back to you pretty good. No, that's fair, Your Honor, and I guess I'm not seeing the distinction between Jones because that was a capital case, and there the Supreme Court said that a district court need not tell the jury what happens procedurally when a verdict cannot be reached. And that's precisely what happened here. Well, he says, let me push you, he says that's true. But he says once you get the question, he says the jury doesn't have to ask you. There's no affirmative duty on the trial judge to say that. Once the jury asks the question, he says you're outside of Jones' zone because now that they've asked, you're put on notice that the jury has a quandary. And his argument is that he's not arguing Jones isn't the law, but he says it's not the law that governs here because the jury asked the question. And he says the trial judge has a duty to clarify the jury other than just saying keep deliberating. He says that wasn't enough. Now, I'm sure Judge Cron didn't want to get into a mini trial with lawyers over what to say. I've been there, done that. And so she says keep deliberating. And so that's his argument. I mean, you know, what do you say to that besides I don't get to argue? Well, there's no law that I'm aware of that requires in that circumstance a judge to explain legally what happens if the jury is not unanimous. And what the jury was asking was a question about process. What's the proper process if we aren't able to reach a unanimous verdict? And so they were essentially asking for a legal response. Well, somebody on the test, this is a poor example, but somebody's taking an exam, you're taking algebra, and the teacher's giving instructions, yada, yada, and you ask the teacher to raise your hand, you say, Ms. Jones, I don't understand what you told us to do about these problems. And the teacher says keep working on the problem. The student has no guidance other than keep working with a dilemma. And while that's a poor example, if you've got a jury that's got instructions, what happens is we're not unanimous and the judge says keep working. I mean, their point is that that's not clarifying for the jury in this extremely complicated matter. They've got 50 pounds worth of instructions, you know, 14,000-page transcript, battling experts, et cetera, and the jury sends a note. So, in other words, he says the note is the quintessential difference here that takes it out of Jones. I'm not saying what he's right, but I'm just saying he says once they send that note, he says you can't hang your hat on Jones and say it's the same. Well, I think, Your Honor, the district court's response here to please continue with your deliberations is the type of response that happens in courtrooms all the time in jury trials. I think trial judges are very wary. It does happen all the time, Mr. Vazoski, but you know and we know this is a federal death penalty case. People's lives are at stake. This is not a tort case. That's not going to get you there with me. Come on, you've got to go better than that. You've got eight minutes on the clock, so the red light's not going to save you on this one. You've got to come up with something better than that. I mean, the defense counsel says no, there are no cases on point, but they say Fackrell and Kramer is the case on point. Well, I think, Your Honor, that part of it is looking at the context here, that the jury had just started deliberating that very morning as to this election phase, and the jury note came at 4 p.m. that same day. And so, you know, what the appellant suggests is that there was some, you know, a holdout juror or someone was confused, and I don't think that there's any support to show that that was actually the case. It was simply a question about process, and as we point out in the brief, that it could have just been simple curiosity that one of the jurors, you know, they're sitting around talking about what happens. And it's not, you know, as Judge Crum said, if it had come to that point, she would have considered giving some, you know, sort of charge, and the parties could have, you know, hashed that out and argued what the appropriate charge would have been. All right, let me put you in another code. You've got six, seven minutes left, so the red light not saving you now. So, all right, let me put you in another context. You've got a non-criminal case, and the jury's all hung up. Well, okay, they send something out. All right, then we've got the famous Allen charge, all right? The judge pulls out the pattern, gives the jury the Allen charge. You know, it's a dynamite charge. It's like, you know, go for it. Back in my days, you know, that's what happened. You give them the Allen charge, you read it explicitly, gives them some guidance, and they keep on moving. Now, I realize this is not that, but I'm just trying to perk your thinking. If in a non-death penalty case, when a jury were asked that, the judge pulls out the Allen charge, not the first time, but if they come back again. So, I'm just saying, what's missing from the potency of the argument here that in a Federal Death Penalty Act case, they've been given instructions, but when they send the note out, it's not enough to just say keep delivering? Well, I guess I don't see much of a difference between what Joan says and that there's no legal requirement to tell the jury about the legal effect of failing to reach a unanimous verdict. And that's exactly what the judge did here is not, you know, she didn't want to give the jury what she would have had to do to be completely responsive to their question. She did not want to tell them about the legal effect of failing to reach a unanimous verdict. And I think she did the appropriate thing here. In terms of the Allen charge, I'm not, and I'll be honest, I'm not familiar with the law in capital cases of, like, if the law is different about when you give an Allen charge in a capital case versus a non-capital case. I would just say that that certainly didn't occur here. When the jury question came out at 4 p.m. on the same day that the question was asked. All right. Well, I think we have you already. I'm not trying to pin you against the wall. I think we've got your argument on there. Let me send you in another space since you're the government. Okay, we've got this issue. I mean, neither one of them raised it in open, but this issue faculty searched about there being missing parts of the record, particularly after this witness, Elizabeth Rose. The government put her on as a final witness, and she apparently had overheard something and put her on and all that kind of stuff. And so, again, you know, they say file. And so I guess some of this is a function that we have some lawyers who were in the case originally, and then we have some new lawyers. But just help me with what I'm saying. And they say there's missing, not missing, but there were portions of conferences that the judge had, particularly about this Elizabeth Rose witness, about which there's no transcript for us to review. And they say that, you know, that missing parts they can't reconstruct, and that's a problem for us. So help me understand, help us understand kind of, you know, that scenario. I know what the government says. Well, there wasn't an open court. So there's no violation of the Court Reporters Act, yada, yada, yada. So just help me contextually understand when and how that series of events occurred. It occurred during, I believe it was during the selection phase. I could be wrong about that. But I would just point the court to the record at 8,523 until 8,558. And there's a lot of back and forth between that's Ms. Rose's testimony. And the prelude to that is some discussion on the record between counsel. And I'm sorry, the part I cited might have been just her testimony. But there certainly was discussion on the record about Ms. Rose's testimony. For example, there was some discussion about whether she was going to have her guilty plea entered before she would be testifying on the stand. And I think it was resolved that she would. And by the time she testified, she had already, in fact, pleaded guilty. And there was another issue regarding a potential conflict of interest, because I believe Ms. Rose was represented in her case by the federal public defender, and the federal public defender was representing Mr. Kramer. But that was worked out as well. And so I think, and I don't know exactly what they're referring to, but I think any outside conversations that aren't on the record are those that occurred in chambers, which, again, happens all the time. And Judge Crum was very careful to say and encourage the parties that if anything that was discussed in her chambers needed to be put on the record, the attorneys were given an opportunity to do that. And I know for the jury instructions, for example, and that's one of the things that they complained about, was that the charge conference was held, well, a discussion of the charge, I should say, was held in chambers. And the first thing Judge Crum said when she came back in open court was she invited the parties to put forth any objections, and they did so. And so I remember reading, and I'm sorry, I have right here the testimony, Ms. Rose, but I think I only printed out her actual testimony. But I seem to recall reading, so it's probably around the record at 8523, some discussion on the record about the circumstances of her testimony. And unless the court has any further questions about that or anything else, I'd be happy to answer them, but otherwise we'll press on our brief. Okay. Any other questions of the government by the panel? No, thanks. Thank you. All right. Thank you, Mr. Visosky. All right. Back to you, Ms. Coldthorpe, for you. You have rebuttal? I'll try to be brief. Does the court want me to address the record issue? If not, I will move on to the issues I talked about initially. No, no, no. It's your eight minutes on rebuttal. You don't have to. I just had seen that one, and because it was the government I had, you know, in front of me, I just wanted to kind of clarify that. But, no, it's your rebuttal. You go with it. Okay, great. So I want to flip here and talk about the psychologist's testimony first. And I want to start with where I ended or where we ended in our conversation, which is about the privilege that attaches to conversations that even folks in prison have with their psychologists. And I want to point out to you that Dr. Klemmer, the government mentioned that Mr. Fackrell had introduced some statements in the Klemmer exhibit. Dr. Klemmer actually secured a waiver from Mr. Fackrell. And she secured that waiver from Mr. Fackrell before she talked to his attorney. Before she talked to his attorney, he secured a psychotherapist waiver from him. That's at record 18-210. And what that tells you is that a BOP psychologist understood statements and the competences that her patients gave to her were covered by the psychotherapist privilege and required a waiver before they were disclosed to others. And no waiver, as far as the record indicates, was secured in this case. I want to move on and talk about Powell and impeachment and rebuttal. Counsel, before you make that point, where was the privilege issue raised and preserved by the defendant? Your Honor, Mr. Fackrell, before Mr. Fackrell said at page 10979 that in the course of his objections, he said, these were statements made to psychologists. It's not the best objection in the world. In our view, that objection, especially in the context of this entire conversation, which was about statements that our client had made to his doctors, that that objection put the court on notice of the privilege. If it did not, we certainly survived plain error. The psychotherapist privilege, I was taught the psychotherapist privilege in law school and that was a long time ago. It is black letter law that psychotherapists keep their patients' statements confidential unless their patients waive it. No waiver. And it clearly, clearly affected Mr. Fackrell's substantial rights. All of the clemor mitigating factors in Mr. Fackrell's mitigation were given to the court. In the brief, the government says the federal death penalty act at all, you know, that that jurisprudence kind of eclipses the common law privileges. What are you saying? There's no reason to believe. This is a privilege, not an evidentiary rule. So we're at sentencing, but we're talking about a core privilege. There's no reason to believe no law to support the argument that privilege does not apply in a capital sentencing proceeding and BOP physician, Dr. Clemor believed that she honored the privilege and she secured a waiver. I'm sorry. No, I'm sorry. I just want to ask, let's assume the common law privilege does apply here. What is the common laws view of when someone puts their mental status in at issue in a legal proceeding? What happens to the common law privilege then? And it's similar to a doctor patient privilege when someone is suing on the basis of, you know, if the other side is entitled to bring in evidence to rebut that not withstanding the privilege, what doesn't that rule apply here? I'm not aware of any cases that say that that rule applies here. And, and so I would really appreciate the opportunity to brief that issue after this, after this argument. I want to move on to the sixth amendment argument. We were correct on that argument on two fronts. The most important is that Mr. Fackler was entitled to warnings and notice, and he didn't give it. Powell makes that clear.   withstanding the privilege. There is a rebuttal right that the government has, but Powell followed close on the heels of Buchanan and Powell said, even in rebuttal, the government has to give warnings and notice. And Powell made clear, I think because it was addressing an argument by the government that this would be too burdensome, that this was in fact, not too burdensome at all. That government agents within the prisons can secure can give notice and warnings easily. In fact, honestly, they could do it on a blanket basis, right? They could just say for all of these conversations and they just didn't do it in this case. So isn't that effectively where your argument would take us? Blanket, blanket warnings and things like that. Every time a prisoner or a defendant would see a physician or a psychologist. Sure. Well, let me, let me put it another way. He was indicted. His right to counsel had attached under a cell. He had a right to warnings and notice and Powell, he had a right to warnings and notice the BOP could decide that it didn't want to do that. It didn't want to give blanket warnings and notice, but once it made that decision, it just can't bring the statements and to trial. So if the government thinks that it's going to want statements like that, then the government has to take the very, very simple step of providing some kind of warning to this defendant when he's being in the middle of his capital sentencing, that the statements he makes to his physicians might be entered against him at trial. I don't think that's asking too much. In fact, I think that's compelled by power. The second reason we're right on the sixth amendment is that even if warnings weren't required, both Powell and Buchanan make clear that there are limits on what the government can do with mental health or medical testimony. And this evidence exceeds those limits. It's not. It's rebuttal Ms. Koltak, it's rebuttal. You know, I mean, that's what rebuttal is about. You know, I mean, they put their stuff on and mental health and when it's out there, putting aside the privilege, you know, the government comes back with rebuttal. I mean, there's a reason there's not a whole bunch of cases on this because it's, you know, kind of the milieu of what we see. Your Honor, I think there aren't a lot of cases on this because I frankly don't think the government goes reaching into criminal defendants, psychotherapists, statements in this way very often because the government knows it violates the sixth amendment. So I, I think that's why we don't have a lot of cases. I think the government crossed the line here and there is proper rebuttal that they're permitted to rebuttal. They, they put on Dr. Hayes who gave strong rebuttal testimony over. You're out of time. We'll give you one minute. No commas, no semicolons, just a straight declarative wrap up. We have the, the federal government is allowed to have a death penalty only in so far as it complies with the eighth and the sixth amendments. It can't be that the government can both seek death, the death penalty and fail to comply with the constitution. We don't have a federal execution system. If the government is not compliant, if the court is not compliant, if the defendant's rights are not protected, we believe reversal is required on all of our points. But especially the points that we raised today. All right. Thank you. Nicely done. No commas. All right, Mr. Bolzer, you have rebuttal. Thank you. I'd like to start again with the court's response to the notes. Just to take on Jones, your honors is correct. That part of the reason it's distinguishable is that it doesn't involve a question. The other reason it's distinguishable though, is that the jurors were told exactly what we're saying. They should have been told as a response to this question, they were told that they could report. They were unable to reach an agreement and should set aside any concerns about the effect of deadlock. That's a five 27. Mr. Bolzer, I mean, I get your point, but I mean, you know, you know we don't get in the heads of jurors. I mean, these jurors were there. They got 14,000 pages. They got a battle of experts. They got two defendants. They have able counsel on both sides, et cetera. The jury's in the box and they're due their duty. You're not going to find, you didn't cite us any cases where we're telling judges, okay, you should have said this. You said this, you should have said that. I mean, there's a lot of discretion here on the trial judge to manage this situation. We get the point from your side. You'd like the judge to have said more, but I didn't read any cases and I've been doing this a while. We don't just normally say, well, judge, you know, you should have said a few more things to unwind. So in the best case scenario, okay, judge could say more, but you got a ways to go to get to say it's reversible error for us to hold in this case that under these circumstances, the judge with no controlling precedent from us didn't tell them more than they were told. And then this is the case where they have absent other, you know, circumstances, not cut out fully blown trial in the whole schmeal, you know, as opposed to us abstractly saying that the judge says continue to deliberate so it is speculation as to what the jury might've been thinking and so on and so forth. I mean, it's an argument, but you want us to hold it as a matter of law in this case, the judge should have said A, B, and C. We don't, you know what I mean? You just wearing our cases that we've been doing it. So two responses. One is I think United States versus split craft from the fifth circuit, Bowen back from the Supreme court, the argument here isn't that we're not challenging what the court said. We're challenging the court's failure to answer, right? I know it's not, it's not that it was an adequate answer. The court did not answer. Right. So you want us to hold as a matter of law, it was reversible error for the trial judge here not to answer the jury's question. Exactly right. They said, what is the process? The courts, they continue to do your deliberations. There's no response, right? That's, it's not an inadequate response. There's no response. And the problem with that is that it suggests that that unanimous will never be acceptable. So it's coercive. So it's, it's both an error under this court's case law Supreme court case laws. You must answer. It says continue to deliberate the judge. If the judge had said more, then you'd be up here arguing. The judge was commenting on the evidence. The judge was getting in the head of the jury. Then the judge has got a mini trial between the lawyers. No, your honor don't say that. Yes, your honor say this. Then all of a sudden you got a trial or we've got a satellite issue on how much the judges say or not say. Judge says they will counsel here. Jury's been hearing this judge. We assume jury's following instruction. Judge says, continue to deliberate. So you want us to hold as a matter of law, when the judge tells the jury to do what he told them to do, that that is reversible error. Under the well-established case law from this court and Supreme court, the court has to answer the question, which it didn't do. And I don't think it's, it's controversial that they were confused. This is at the end of the full day of deliberations, right? Capital sentencing deliberations. They had been told at the final and the final instructions you're deliberate. Your decision is individualized. You individually find and weigh mitigating factors. You individually determine what the outcome is. The verdict sheet did not give them any place to effectuate that. So of course it's not surprising that they had a question about that. What do we do if we have different outcomes? There's no place to make that happen. Judge, can you tell us what the process is? The process is you continue your deliberations. So the answer suggests, suggests your mere words suggest, you know, that's speculative. It suggests. So you want the panel to get in the juror's head. You know, it's, it suggests that that's my pushback on it. It suggests, I mean, you make an argument, but it suggests that we as a panel sort of get in the juror's head in terms of what they might've been thinking, which is impermissible. And, you know, it's kind of to me, no harm in asking, but to me that's a long way from us holding as a matter of law is reversible error, not just for this case, but a case for us. If the jury says it's no bad, we're going to order the trial. You must answer the question. When you answer the question, you must do part A, B, and C. I'm not being facetious, but I'm just trying to take to the limit what you're asking the court to do. I'm not minimizing your, you know, representing a real client. This is not an abstraction. Don't get me wrong, but I'm just trying to take to the end what you're asking the panel to do, to hold as a matter of law, that when the judge gets a question from the jury, as here, and the judge says, continue to deliberate. No off-the-cuff remark, nothing, you know, off. We just continue to deliberate. And it's in the context of all the other instructions that the judge has given the jury about what they are to do. Those other instructions, I think, create the confusion. That's the problem. All right. And it's a narrow, I'm asking for a narrow holding. When the juror asks a question, you must answer it. If you don't answer it, and what you do tell them, risk a coerced verdict, that's a reversible error. You don't have to get to B and C. The argument here is if the court failed to do A, which is answer the question. Gotcha. I'll turn quickly to the inconsistent verdict point. As an initial matter, the government argues that this is not preserved, but the government has never dealt with the actual case site. So I read at the beginning of the argument the lengthy passage about defense counsel worked this miraculous transformation. You have to consider the source. Defense counsel worked this miraculous transformation. At that point, at the end of that lengthy paragraph, there's an objection from defense counsel, and it's on the Tenard point, as the government points out. It's about the point that Ms. Coltharp argued, this improper connection between the mitigation and the offense. That is true. The first objection is about that. But the government continues. It's a whole framing. You must consider the source, and the source is these defense counsel who are shady because they've engaged in this mispractice, this sharp practice. At that point, there is an objection. This is on ROA 11660. Your Honor, I'm going to object. That's an improper attacking of defense counsel by stating that this is something from the attorneys. It is based upon the evidence from the witness stand and from exhibit. It is a proper closing argument and attacking counsel. And as I mentioned previously, there has been a motion to eliminate highlighting argument that denigrates defense counsel, highlighting argument that imposes the cost for having exercised the right to plead not guilty and ask the jurors to hold the government to its proof. So it's fully preserved. And it is on all fours with United States v. Dakar, and the citation is 912, FEDVIRD 1, second circuit, 2018. All right, Mr. Boese, you're out of town. I'll do you like to be a co-counselor. You got one minute, sum up, no commas, no semicolons, and definitely no parentheticals. In this case, this issue is on all fours with Dakar, where the misconduct was only three sentences there. This is nearly a full page of inconsistent theories. And the second circuit found that was enough to satisfy the federal court's decision to remove the penalty just two years ago. All right. All right. Thank you, sir. If you make it short, you definitely don't violate that rule about commas and semicolons, right? Good deal. All right. Thank you, Ms. Goldthorpe and Mr. Boese, Ms. Goldthorpe, your CJA counsel. I cannot overstate the appreciation of our court and all courts for the work of CJA counsel in all cases. And certainly in these death penalty cases, we appreciate the able briefing and advocacy. These are tough cases, to put it mildly. There are lots of issues and so forth, and so we appreciate the points that you've made. And to give you a bonus for that, you've volunteered to give the panel additional help. We'll take all the help we can get. My colleague, Judge Duncan, asked you a marvelous question about the intersection of putting your mental health at issue and what happens to the privilege, and you so nobly volunteered to help the court out. So you're going to get your wish. So I'm going to give you seven days to give us some help on that matter. I'm going to trust you on page length, but don't send no toll mail on this issue to flesh it out on the point of Mr. Zazoski. I'm going to give her seven days to get it filed, and I'll give you five days to respond after. It's going to take a while to go through this big record anyway. But just narrowly to kind of that point, let her brief and file it with the clerk, and then at least after that we'll have some help. There's lots of issues here, and you honed in on the ones argued, but we take on the briefs to other issues that you didn't argue, but that are in here and we'll take the deep dive into the record. Mr. Zazoski, thank you to the government for being duly battling with two lawyers to do it, but it's a big case, and we'll get to it and we'll get it decided. So thank you both for that, and this concludes the argument in the Fackle and Kramer cases. Thank you. Have a good day. Thank you. Thank you.